UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11845-RGS

UNITED STATES OF AMERICA

v.

939 SALEM STREET, LYNNFIELD, MASSACHUSETTS, and
2900 NW 25TH TERRACE, BOCA RATON, FLORIDA

MEMORANDUM AND ORDER ON GOVERNMENT'S MOTION
FOR SUMMARY JUDGMENT OF FORFEITURE

January 22, 2013

STEARNS, D.J.

In this *in rem* civil forfeiture action, the government seeks to take title to real

property, a residence located at 2900 NW 25th Terrace, Boca Raton, Florida.[1]  *See* 18

U.S.C. § 981(a)(1)(A) and (C).   The government maintains that the Boca Raton

property was purchased by Robert Eremian with proceeds traceable to Sports Offshore

(SOS), an illegal gaming business based on the island of Antigua where Robert

Eremian has lived and worked since 1996.  Discovery now complete, the government

---

[1] On July 17, 2012, the court entered an Order of Forfeiture of $25,000 against
Robert Eremian, in satisfaction of any interest he might have retained in a former
residence at 939 Salem Street in Lynnfield, Massachusetts.  Any claim by the United
States to the Lynnfield property involving Lauren Eremian was settled the same day by
agreement of the parties.

moves to terminate the action by way of summary judgment.

In a "Verified Statement of Interest," Lauren Eremian, the estranged (but legally married) wife of Robert Eremian, claims an equal and undivided ownership interest in the Boca Raton property (which she uses as her primary residence). Lauren Eremian maintains that the property was purchased with legitimate earnings from Robert Eremian's business operations. More plausibly, Lauren Eremian raises an innocent owner defense. *See* 18 U.S.C. § 983(d). A hearing on the motion for summary judgment was held on October 26, 2012.

## BACKGROUND[2]

Robert Eremian made his living as a bookmaker in the Boston area for eleven years before moving to the island of Antigua in the West Indies. While living in Massachusetts, Eremian owned a home in Lynnfield with his wife Lauren. The Eremians relocated to Antigua with their children in 1996, where Robert established himself as a "software consultant" in the "interactive gaming and interactive wagering" industry. He founded SOS, a sports betting enterprise offering telephone and internet facilities primarily to U.S. citizens interested in wagering on sporting events.

In 1998, Lauren Eremian and the children returned to the United States. The

---

[2] Lauren Eremian disputes only the factual assertions set out in Paragraphs 23, 32, 33, 34, 35, 37, 52, and 53 of the Government's Statement of Undisputed Facts (Gov't SOF). *See* Dkt # 57.

Eremians have since lived apart.  Robert Eremian cohabitates with an Antiguan woman with whom he has a child, but continues to provide Lauren Eremian with financial support.  In the summer of 2000, Robert Eremian was indicted in the District of Massachusetts for various federal gaming offenses.  He eventually agreed to plead guilty, and was sentenced to a term of probation by Judge Tauro on October 8, 2002.  As part of his plea agreement, Eremian was required to satisfy his federal tax arrears from 1996 to 2000 (which he did).  Two months after the sentence was imposed, Robert Eremian returned to Antigua (with the permission of the court) where he resumed his employment with SOS.  Eremian has since regularly filed a U.S. tax return.  On December 10, 2003, he became a dual citizen of the United States and Antigua.

On May 26, 2006, Robert and Lauren Eremian purchased the Boca Raton property for $800,000.  *See* Gov't SOF  ¶ 38.  A down payment of $100,000 was tendered through the realtor, Coldwell Banker, by means of a check dated April 18, 2006, drawn on a Robert Eremian account at Antigua Overseas Bank Ltd.  Coldwell Banker, in turn, issued a check on May 22, 2006, in the same amount to Sunbelt Title.  *See id.* ¶ 39, ¶ 53.

At the closing, the Eremians tendered $696,025.01 in purchase money in the form of a Bank of America cashier's check.  *See id.* ¶¶ 40-41.  The cashier's check was purchased on May 25, 2006, with funds drawn from Bank of America account number

xxxxxxxx7523, held in the name of Lauren A. Eremian.  *See id.* ¶ 42; Murrane Decl. -

Ex. 26 (Bank of America records) and Ex. 25 (Lauren Eremian Dep. at 45-46).  Two

days prior, on May 23, 2006, Bank of America account number xxxxxxxx7523

received an Antigua Overseas Bank wire transfer in the amount of $749,936.60.  *See*

Gov't SOF ¶ 43; Bank of America records; and Lauren Eremian Dep. at 51.  The wire

transfer was initiated by an entity known as Benevolence Funding to Antigua Overseas

Bank.[3]  *See* Gov't SOF ¶ 44; Bank of America records; and Lauren Eremian Dep. at

51.  The Eremians took title to the property as tenants by the entirety.  Eremian Resp.

at 3 n.1.

On August 5, 2010, a federal grand jury in Massachusetts returned a 442-count

Superseding Indictment against Robert Eremian and three co-defendants[4] alleging,

among other crimes, racketeering in violation of 18 U.S.C. § 1962; illegal gambling in

violation of 18 U.S.C. § 1955; and money laundering in violation of 18 U.S.C. §§ 1956

and 1957.  As described in Count One of the indictment:

[f]rom in or before 1997 and continuing through April 2010, within the
District of Massachusetts and elsewhere, the defendants Robert Eremian,

---

[3] Prior to the wire transfer, Lauren Eremian's Bank of America account balance
was $3,262.84.  Gov't SOF ¶¶ 46-47.

[4] Robert Eremian is named in 355 counts of the indictment.

> Daniel Eremian, Richard Sullivan, Todd Lyons, and others known and unknown to the Grand Jury, were members and associates of a criminal organization whose members and associates associated together and with others for the purpose of, among other things: (1) earning money through illegal gambling activities via a business known as "Sports Offshore"; (2) illegally laundering the proceeds of illegal gambling activities; and (3) committing various crimes related to the operation of an illegal gambling business.

Murrane Decl. - Ex. 8 (Superseding Indictment at ¶¶ 1-2).  The indictment also sought the forfeiture of any personal interest that Robert Eremian held in, among other properties, the Boca Raton residence.

Robert Eremian retained counsel to represent him with respect to the new criminal charges, but ultimately refused to return to the United States from Antigua to face trial.[5]   In his absence, the trial proceeded against Eremian's co-defendants, including his brother, Daniel Eremian.  From the testimony at trial, a fulsome portrait of SOS's financial dealings emerged.  According to insider witnesses, funds collected by SOS agents from bettors in the United States were hand-carried in cash or converted into checks or wire transfers and deposited into an account at Antigua Overseas Bank owned by Benevolence Funding, a shell corporation controlled by Robert Eremian.  On December 5, 2011, at the conclusion of the twenty-day trial, the jury found Todd Lyons and Daniel Eremian guilty on Counts One through Five.  *See id*. - Ex. 9 (Jury Verdict

---

[5] Internet gaming is not a criminal offense under Antiguan law.  Consequently, the extradition treaty between Antigua and the United States does not apply.

Form).  The court (Judge Saris) then held a three-day bench trial on the forfeiture count.

On June 29, 2012, Judge Saris issued findings of fact and rulings of law determining

that Daniel Eremian was chargeable with $7,366,095 of the total SOS gambling

proceeds, while Todd Lyons was responsible for $24,504,126.  *See U.S. v. Lyons*, 870

F. Supp. 2d 281, 296 (D. Mass. 2012).  Judge Saris further held that the sums charged

to Daniel Eremian and Todd Lyons did not reflect the full amount of the forfeitable

gaming proceeds amassed by SOS.  The ensuing forfeiture order issued against these

defendants personally, and not against SOS as an entity.

On September 30, 2011, this court allowed Robert Eremian's motion to

withdraw his personal claim to the Boca Raton property.  The only issue that remains

is whether Lauren Eremian's undivided half-interest in the property is forfeitable.[6]

## DISCUSSION

Summary judgment may be entered in an *in rem* civil forfeiture action where the

moving party satisfies the familiar Rule 56 standard.  *Celotex Corp. v. Catrett*, 477

---

[6] Lauren Eremian argues variously that she is an innocent owner (as defined by 18 U.S.C. §983(d)); that because the Boca Raton property was owned with her husband as tenants in the entireties, it is not subject to forfeiture under Florida law; that the property is protected from forfeiture by the Florida homestead exemption; and, that there is no provable nexus between the property and any criminal activity.  Two additional arguments are raised in her Response – "that venue was improper in Massachusetts as the Property was located Florida," and "that the Government lacked probable cause to institute the forfeiture proceeding."  Eremian Resp. at 3-4.  As these latter two issues are not briefed in any meaningful way, the court deems them waived.

U.S. 317, 323 (1986) (the party seeking summary judgment bears the initial burden of establishing "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); s*ee, e.g.*, *United States v. 6 Fox St.*, 480 F.3d 38, 42-43 (1st Cir. 2007) (summary judgment properly entered where the United States "provided ample . . . evidence of a substantial connection between [defendant's] drug trafficking and his properties" ).  A showing sufficient to satisfy Rule 56 may also overcome an innocent owner defense.  *See*, *e.g., United States v. Parcel of Land and Residence at 18 Oakwood St., Dorchester, Mass.*, 958 F.2d 1, 4 (1st Cir. 1992); *United States v. 198 Training Field Rd.*, 2004 WL 1305875, at *3 (D. Mass. June 14, 2004); s*ee also United States v. Premises Known as 717 S. Woodward St.*, 2 F.3d 529, 533 (3d Cir. 1993) ("It is clear that a claimant's bare denial of knowledge or consent may be insufficient to withstand summary judgment in a forfeiture case.").

The Civil Asset Forfeiture Reform Act of 2000 (CAFRA) establishes a procedural pavane which somewhat modifies the usual thrust and parry of summary judgment.  At the first step, the government must show by a preponderance of the evidence that the property at stake is subject to civil forfeiture.  *See* 18 U.S.C. § 983(c)(1).  If the government so demonstrates, the burden shifts to the claimant to step

forward with a showing, again by a preponderance of the evidence, that the property is free of any criminal taint, or that she is its "innocent owner." *See United States v. One Parcel of Real Prop. Known as 45 Claremont St.*, 395 F.3d 1, 4 (1st Cir. 2004); *United States v. Cleckler*, 270 F.3d 1331, 1334 (11th Cir. 2001). An "innocent owner" is a person who at the time the property was acquired was a bona fide purchaser for value who did not know (and had no reasonable grounds to know) that the property in question was forfeitable. 18 U.S.C. § 983(d)(3)(A).

In making its case for forfeiture, the government asserts that the Boca Raton residence was purchased by Robert Eremian with the proceeds of racketeering activity in violation of 18 U.S.C. §§ 1955 (illegal gaming), and 1957 (engaging in monetary transactions in property derived from an unlawful gambling business).[7] The

---

[7] Title 18, United States Code, Section 1955 states that:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
(b) As used in this section - (1) "illegal gambling business" means a gambling business which - (i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day. (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein. (3) "State" means any State of the

government relies principally on the evidence adduced at the trial of Todd Lyons and

Daniel Eremian, which the government argues established beyond a reasonable doubt

that the SOS gaming business was conducted in violation of 18 U.S.C. § 1955.  The

government further cites evidence that SOS served as Robert Eremian's principal (if

not sole) source of income and that the Boca Raton home was purchased with funds

provided by Benevolence Funding, an SOS entity controlled by Robert Eremian.  The

government asks the court to take judicial notice of the record in *United States v.*

*Eremian*, D. Mass. 10-cr-10159-PBS, including Judge Saris' findings in the forfeiture

phase of the trial.

———————————

United States, the District of Columbia, the Commonwealth of Puerto
Rico, and any territory or possession of the United States.

[Gambling is illegal in Massachusetts pursuant to Mass. Gen. Laws ch. 271, §§ 5, 5A,
16A, 17, and 17A].

Section 1957 of Title 18 states that:

(a) Whoever, in any of the circumstances set forth in subsection (d),
knowingly engages or attempts to engage in a monetary transaction in
criminally derived property of a value greater than $10,000 and is derived
from specified unlawful activity, shall be punished as provided in
subsection (b).

         *      *      *      *

(c) In a prosecution for an offense under this section, the Government is
not required to prove the defendant knew that the offense from which the
criminally derived property was derived was specified unlawful activity.

Court records memorializing facts "tested in the crucible of trial" fall within the ken of judicial notice. *Cf. Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995). Judicial notice extends to the records of sister courts. "It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) (jury properly permitted to consider a defendant's criminal conviction in assessing damages in a civil case); s*ee also E.I. Du Pont de Nemours & Co. v. Cullen*, 791 F.2d 5, 7 (1st Cir. 1986) (judicial notice of a complaint filed in a state action); *United States v. Gordon*, 634 F.2d 639, 642 (1st Cir. 1980) (judicial notice of an indictment returned by a federal grand jury in another district).

At the Lyons-Daniel Eremian criminal trial, witnesses directly involved in the SOS gaming business[8] testified that SOS's gambling proceeds were funneled through accounts maintained by Benevolence Funding and other SOS-related shell corporations.[9]   The testimony further established that Benevolence Funding had no

---

[8] They included Andrew Pomper, William Means, Lewis Restuccia, Justin Waranis, Lindsey Perry, George Prussin, Michael Edward Galvin, Timothy Lowry, Frederick Porter, and John Olsen.

[9] The specific testimony establishing Robert Eremian's dominance of Benevolence Funding and the role that Benevolence Funding played in laundering SOS gaming proceeds (as set out in the Declaration of Mary Murrane) is as follows: Trial Testimony, Day 5 - Christopher Means, 19:8-20:10 and Andrew Pomper, 104:17-106:21; Day 6 - Lewis Restuccia, 12:2-14:22, 20:21-22:3 and William Means, 11:24-

business purpose other than to serve as a vehicle for the receipt and disbursement of

gaming proceeds.  And finally, witnesses testified that Benevolence Funding was

controlled by Robert Eremian who oversaw the flow of SOS's gambling profits.  The

government also relies on the paper trail showing that the funds paid over by the

Eremians at the closing on the Boca Raton property were transferred to Lauren

Eremian's Bank of America account at the direction of Benevolence Funding.  In sum,

the government's evidence is more than sufficient to satisfy its preliminary burden of

showing by a preponderance of the evidence that the Boca Raton residence is

forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

Implicitly acknowledging the force of the government's evidence in this regard,

Lauren Eremian does not dispute the fact that Benevolence Funding was intimately

connected to SOS's gaming operations[10] or that it operated under the control of Robert

---

13:12, 26:6-27:13; Day 8 - Richard Ducharme, 18:5-18:22, 40:12-42:22; Day 10 -
Lindsey Perry, 19:3-21:1; Day 11 - Timothy Lowry, 68:15-70:21; and Day 13 - John
Olsen, 26:7-26:21, 29:12- 29:17.

[10] She explains in her Response that "[t]he Benevolence Funding US Dollar
account, which has been scrutinized by the Government, is where most of the gaming
proceeds emanating from SOS's U.S. players were deposited. The Benevolence
Funding US Dollar account was primarily used to pay all local expenses in Antigua.
When US Dollars were received into Benevolence Funding's US Dollar account, they
would then be converted into Eastern Caribbean (EC) Dollars and transferred to
Benevolence Funding's local EC Dollar account for disbursement." Eremian Resp. at
11.

Eremian.  Rather, she disputes the government's contention that all of the money that

flowed through Benevolence Funding consisted of gambling proceeds, or if it did, that

all of it was necessarily illegal.[11]  In this regard, she relies on Judge Tauro's decision

to permit Robert Eremian to return to work at SOS in Antigua despite being placed on

probation after his 2002 gaming conviction in the District of Massachusetts.  She also

cites a 2004 ruling of the World Trade Organization declaring internet gaming in

Antigua (over the objection of the United States) to be a legal business.  Finally, in

spite of her claim to know nothing of her husband's business affairs,[12] she maintains

---

[11] At her deposition, Lauren Eremian admitted that she knew that her husband's
Massachusetts gaming operations were conducted in violation of the law, although she
professed to believe that his Antigua-based gambling business was "licensed" and
therefore legal.  The government for its part contends that Lauren Eremian's assertion
that she believed the Antigua gambling operation to be legal is irrelevant as "'[a]ll
citizens are presumptively charged with knowledge of the law.'"  *United States v.
Ferro*, 681 F.3d 1105, 1113 (9th Cir. 2012), quoting *Atkins v. Parker*, 472 U.S. 115,
130 (1985).  This is certainly true as a general proposition, although the doctrine of
*ignorantia juris non excusat* is less firm when it comes to complex "specific intent"
laws that are essentially regulatory in nature.  *See Cheek v. United States*, 498 U.S.
192, 203 (1991).

[12] She states in her Response that:

> Claimant has never worked for SOS, has never had any
> involvement in Mr. Eremian's business or financial affairs,
> nor the business or financial affairs of SOS. She was never
> privy to Mr. Eremian's financial dealings with SOS and
> Benevolence Funding, and she was not privy to his
> employment duties with SOS or Benevolence Funding. *See*
> Robert Eremian Aff. ¶ 31; Lauren Eremian Aff. ¶ 6.

that all of the funds used to purchase the Boca Raton property came from legitimate

sources, namely from the repayment of three personal loans (two of which were

allegedly made to co-defendant Daniel Eremian) and from a "consulting fee" he

supposedly earned from Carib International Entertainment Ltd.  The troubling aspect

of this contention is that its truth depends on an affidavit executed by Robert Eremian

for the specific purpose of opposing the government's motion for summary judgment

in this proceeding.  *See* Robert Eremian Aff. ¶ 2.

In her Response, Lauren Eremian recites the following assertions drawn from her

husband's affidavit:

> In February 2004, Daniel Eremian sent a check to Robert Eremian which
> was payable to Benevolence Funding in the amount of $230,000 which
> was the proceeds from the insurance money paid to him after a fire
> destroyed his restaurant in Florida in July 2003.  This represented a
> repayment of a loan. Exhibit J.
>
> In November 2004, Mr. Annette Perini sent a check to Robert Eremian
> which was payable to Benevolence Funding in the amount of $150,000

*    *    *    *

> Claimant was never privy to Mr. Eremian's tax returns and
> the parties have always filed income tax returns separately
> since their separation in 2001.  The Claimant was never
> privy to Mr. Eremian's personal earnings, tax payments, or
> the source of his income.  *See* Robert Eremian Aff. ¶ 32;
> Lauren Eremian Aff. ¶ 7.

Eremian Resp. at 14.

13

which was repayment of a loan owed by Vincent Perini. IRS Agent Kelly Bennett interviewed Mr. Perini's sister-in-law, Maryellen Murphy, who confirmed the check was repayment of a loan. Exhibits K & L.

In April 2006, Daniel Eremian sent a wire transfer to Robert Eremian which was payable to Benevolence Funding in the amount of $125,000 which represented the proceeds of the sale of his liquor license from his restaurant in Deerfield Beach, Florida. This represented a repayment of a loan. Exhibit M.

In early 2006, Carib International Entertainment Ltd. paid Robert Eremian $1,500,000 through a wire transfer payable to Benevolence Funding as payment for software consulting and royalties due to Robert Eremian. Exhibit N.

Eremian Resp. at 12-13.  Even if the affidavit of Robert Eremian was to be fully credited, it must be noted that two of the three "loans" were allegedly repaid two years prior to the purchase of the Boca Raton property.  (The reader is asked to infer that these funds remained pristinely segregated from any tainted funds deposited in the Benevolence Funding account).  Moreover, the supporting exhibits that Lauren Eremian cites are merely copies of checks *made out to Benevolence Funding* with no admissible evidence supporting the supposed benign nature of the sums at issue.[13]  Most troubling of all, however, is the fact that Robert Eremian's affidavit cannot be tested by the government, given his decision to waive any claim to the Boca Raton property (not surprisingly as a warrant remains outstanding in his criminal case).  While Robert

---

[13] Lauren Eremian offers no evidence that, even if these loans were in fact made, they were funded with legitimately earned money.

Eremian is no longer a claimant in this case, he remains an interested party because of his ongoing obligation to provide support to Lauren Eremian (to whom he is still legally married).  And although he is technically not a fugitive in this proceeding, it works an unfairness on the court and on the government to permit Lauren Eremian to hide behind an affidavit that Robert Eremian is unwilling to defend.  Consequently, the court will give the affidavit no weight in deciding the issue of "innocent funds" adversely to Lauren Eremian.  *Cf.  Degen v. United States*, 517 U.S. 820, 827 (1996).

Having concluded that Lauren Eremian has failed to rebut the government's factual showing that the funds used to purchase the Boca Raton property came from a tainted source, I will turn to her "innocent owner" defense and the related defenses based on Florida property law.  Accepting for present purposes Lauren Eremian's protestations that she truly believed that her husband's business was perfectly legitimate, she faces an insurmountable hurdle in the attempt to fit herself within the CAFRA innocent homeowner exception.  Namely, she cannot show that she was a "bona fide . . . purchaser for value" – she conceded in her deposition that all of the funds used to purchase the Boca Raton residence came from Robert Eremian and that she personally contributed nothing.  Lauren Eremian Dep. at 96.  The law is clear that when a family member receives property (or the funds to pay for it) as a gift, she cannot claim the status of a bona fide purchaser.  *See United States v. $125,938.62*, 537 F.3d

1287, 1293 n.3 (11th Cir. 2008); *In re Bryson*, 406 F.3d 284, 291-292 (4th Cir. 2005); *see also United States v. 10150 NW 133 St.*, 278 Fed. App'x. 880, 883 (11th Cir. 2008) (claimant's assertion that she did not know that the funds given to her by her daughter to purchase property were fraud proceeds was irrelevant under § 983(d)(3) because she gave nothing of value in return); *United States v. McHan*, 345 F.3d 262, 279 (4th Cir. 2003) (wife not bona fide purchaser of jointly held property for which she tendered no consideration).

Finally, she cannot claim the protections of the "homeless" exception to the bona fide purchaser rule set out in § 983(d)(3)(B), as divesting her of the Boca Raton property would not deprive her of the "means to maintain reasonable shelter in the community" (as subsection (B)(ii) stipulates).  Lauren Eremian testified that she works full time at American Express, earning $37,000 annually, and that she receives $11,000 to $16,000 monthly from Robert Eremian in support payments.[14]

Apart from the conceptually flawed innocent owner defense, Lauren Eremian makes several related Florida real estate law arguments.  She first argues that under the Florida homestead exemption, real estate owned as a principal residence is nonforfeitable.  While this is a correct statement of Florida law, state law serves only

---

[14] All of the Eremians' children are adults and none live with her at the Boca Raton property.

to define the interest that a claimant has in forfeitable property.  Whether that interest will defeat the government's interest in forfeiture of the property is defined by federal law.  *See United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 33 (1st Cir. 1999) ("State law determines the claimant's ownership interest in the [defendant property], but then federal law determines the effect of his ownership interest on h[er] right to bring a claim.").  As a matter of federal law, the Florida homestead exemption is preempted by the federal forfeiture statute.  This was true prior to CAFRA and is true today.  *See United States v. One Parcel of Real Estate at 3262 SW 141 Ave.*, 33 F.3d 1299, 1301 n.6 (11th Cir. 1994) ("[F]ederal forfeiture law preempts the Florida homestead exemption."); *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1311 n.14 (11th Cir. 1999) (same).  *See also United States v. Fleet*, 498 F.3d 1225, 1231 (11th Cir. 2007) (same).

Lauren Eremian next argues that because she and Robert Eremian hold the property by a tenancy by the entireties, it cannot be divided to carve out Robert Eremian's interest at her expense.  In the pre-CAFRA case that she cites, *United States v. One Single Family Residence*, 894 F.2d 1511 (11th Cir. 1990), the court declined to order the forfeiture of a wife's share of the property where the wife was found to be an innocent spouse.  The court saw "no way for the government to obtain a meaningful share in an entireties property without forfeiting some part of the innocent spouse's

17

interest, as long as the spouses remain married to each other and do nothing to terminate the entireties estate." *Id.* at 1512. The *One Single Family Residence* case is, however, distinguishable because Lauren Eremian does not (as earlier explained) qualify under the forfeiture statute as an innocent spouse. *See Fleet*, 498 F.3d at 1231.[15]

Lauren Eremian's final title-based argument involves the supposed nonforfeitability of the property as a "substitute asset" as she is not personally charged with criminal misconduct. The argument confuses the rules governing criminal and civil forfeiture. In a criminal forfeiture case, where a defendant's forfeitable assets are unavailable or untraceable at the time of conviction, the government may seek forfeiture of other property as a substitute asset. To that end, the United States moves for entry of a personal money judgment against a defendant as a component of the sanction imposed for the criminal conduct. *See* Fed. R. Crim. P. 32.2(b); Fed. R. Crim. P. 32.2(e). Where substitute property is at issue, the only viable defenses to its forfeiture are that the value of the substitute property exceeds that of the property the defendant must forfeit or that the tainted property is unavailable through no fault of the defendant.

---

[15] In the qualifying "innocent spouse" case, CAFRA gives the court the authority to order the liquidation and distribution of property held by a husband and wife as tenants by the entirety, or to grant the innocent spouse the right to remain in possession of the property subject to a lien in favor of the government on the guilty party's interest. *See* 18 U.S.C. § 983(d)(5).

*See Fleet*, 498 F.3d at 1232 ("There is no innocent spouse defense to criminal forfeiture because the only property being forfeited is the interest that belongs to the defendant."). In contrast to criminal forfeiture, which is *in personam*, civil forfeiture is *in rem*. The named defendant is the property that the United States contends is forfeitable based upon the property's connection to a predicate criminal offense. Here the United States named the Boca Raton property as directly forfeitable as a fruit of the proceeds of illegal gambling and as property involved in money laundering. As such, the property is not a "substitute asset." 21 U.S.C. § 853(p).

Because Lauren Eremian is not a bona fide purchaser for value of the Boca Raton residence, and because Florida real estate law is preempted by the federal forfeiture statute, she cannot overcome the government's showing that the Boca Raton property is forfeitable as the proceeds of and involved in criminal activity.

## ORDER

For the foregoing reasons, the government's motion for summary judgment is ALLOWED. The United States will file a proposed Order of Final Judgment within fourteen (14) days of the date of this decision.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

19